917 P.2d 1284

STRAUB CLINIC & HOSPITAL,
Petitioner,

v.

The Honorable Dan T. KOCHI; KPMG
Peat Marwick, aka Peat Marwick Main
& Co., fka Peat Marwick Mitchell & Co.;
Infotech, a Hawai'i general partnership;
Kapiolani Information Systems, Inc., a
Hawai'i corporation; Hicord, Inc., a Ha-
wai'i corporation; Kapiolani Health
Care System, a Hawai'i non-profit cor-
poration; Kapiolani Medical Center for
Women and Children, a Hawai'i non-
profit corporation; and Shared Medical
Systems Corporation, a Delaware corpo-
ration, Respondents.

No. 19592.

Supreme Court of Hawai'i.

May 23, 1996.

Edward A. Jaffe, Ronald I. Heller and Stephanie A. Chin of Torkildson, Katz, Jossem, Fonseca, Jaffe, Moore & Hetherington, on the briefs, Honolulu, for petitioner.

Margaret Jenkins Leong, David J. Dezzani, Jacqueline Earle, and Wilma Sur of Goodsill Anderson Quinn & Stifel, on the briefs, Honolulu, for respondents.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

PER CURIAM.

In this original proceeding, the plaintiff-petitioner Straub Clinic & Hospital (Straub) petitions this court for a writ directing the respondent Judge Dan T. Kochi, Judge of the Circuit Court of the First Circuit, State of Hawai'i to vacate: (1) the November 1, 1995 order (disqualification order) granting the third-party defendants/respondents Info-Tech, Kapiolani Information Systems, Inc., HICORD, Inc., Kapiolani Health Care System, and Kapiolani Medical Center for Women and Children's (collectively, the Kapiolani entities) [1] motion to disqualify the law firm of Torkildson, Katz, Jossem, Fonseca, Jaffe, Moore & Hetherington (the Torkildson firm) from any further representation of Straub in *Straub Clinic & Hospital, Inc. v. KPMG Peat Marwick*, Civil No. 93–0646–02; and (2) the February 1, 1996 order denying Straub's motion for reconsideration of the disqualification order. In the alternative, Straub asks us to vacate the disqualification of the entire

---

1. Kapiolani Health Care Systems (KHCS) is the parent organization of all other Kapiolani entities. Kapiolani Medical Center for Women and Children is the flagship medical facility of KHCS. HICORD, Inc. is a wholly owned subsidiary of KHCS and the parent corporation of Kapiolani Information Systems. InfoTech was created as a partnership owned fifty percent by Straub and fifty percent by Kapiolani Information Systems. Since June 1992, InfoTech has been owned fifty percent by Kapiolani Information Systems and fifty percent by Kapiolani Health Management Service, another wholly owned subsidiary of HI-CORD.

Torkildson firm and remand with instructions directing the circuit court to limit the disqualification to J. George Hetherington and Roger W. Fonseca, while permitting other attorneys in the Torkildson firm to continue to represent Straub in this action. The Kapiolani entities filed a response to the petition opposing vacation of the disqualification order and contending that the circuit court's order of disqualification was correct.

Based upon the following, we conclude that the circuit court properly granted the motion to disqualify the Torkildson firm and that Straub has failed to demonstrate an indisputable right to the requested relief. Accordingly, the petition is denied.

## I. BACKGROUND

In 1986, Straub and the Kapiolani entities were considering various alternatives to meet their computer needs. The two considered a joint venture and engaged the respondent Peat Marwick to identify and determine the cost of the available alternatives. After investigating the potential options, Peat Marwick submitted a study suggesting that the joint venture was feasible and that it provided the least expensive alternative. Relying on Peat Marwick's evaluation, Straub entered into the joint venture with Kapiolani Information Systems and formed a partnership, which the parties named InfoTech. J. George Hetherington, a partner in the Torkildson firm, represented Straub, Kapiolani Information Systems, and InfoTech in connection with the finalization of the InfoTech joint venture agreement.[2] In 1987, Hetherington prepared the joint venture agreement and the long-term exclusive services contracts involving Straub, Kapiolani Information Systems, and InfoTech. Two representatives of Straub and two of Kapiol-

ani Information Systems served on the board of InfoTech. Hetherington also participated in later negotiations and drafted contracts between InfoTech and the third-party defendant/respondent Shared Medical Systems Corporation (SMS) for the purchase of computer software.

In 1991, Straub sought to withdraw from InfoTech. Kapiolani Information Systems opposed the withdrawal. After informal settlement efforts failed, Hetherington advised Straub, Kapiolani Information Systems, and InfoTech to engage separate counsel, other than the Torkildson firm, and to attempt to arbitrate the dispute regarding Straub's withdrawal. During the arbitration, Straub and Kapiolani Information Systems reached a settlement that was finalized in a settlement agreement and mutual release, signed on June 5, 1992. One aspect of the settlement was that Straub would withdraw its fifty percent ownership of InfoTech, resulting in one hundred percent ownership by the Kapiolani entities. The Kapiolani entities would pay Straub a cash settlement and relieve Straub of any further payments owed to InfoTech. Neither the settlement agreement nor the mutual release contained an indemnification provision.

On February 17, 1993, Straub, through the Torkildson firm, filed a complaint against Peat Marwick, alleging that Peat Marwick had intentionally misrepresented the benefits of the joint venture as compared to an in-house computer system. Straub alleged that the motive for the misrepresentation was that Peat Marwick was aware that it would earn more than one million dollars a year in consulting fees if the joint venture were formed. No claims were asserted against the Kapiolani entities.

Although the trial was scheduled to begin in July 1995, on December 23, 1994, Straub

2. Prior to the formation of InfoTech, virtually all of Straub's legal work was performed by the Torkildson firm. Because the Torkildson firm also performed ongoing legal work for the Kapiolani entities, the parties agreed that the Torkildson firm should serve as legal counsel for the joint venture. According to Harvey Smith, a corporate officer of the Kapiolani entities, the Torkildson firm was general counsel for the Ka-

piolani entities in all legal matters, except tax and bond financing, during the relevant time period. At least thirteen attorneys associated with the Torkildson firm performed work for the Kapiolani entities. At the time the motion to disqualify was filed, Fonseca, a partner in the Torkildson firm, was preparing retirement plans for the Kapiolani entities including InfoTech.

and Peat Marwick stipulated that Peat Marwick could file a third-party complaint against the Kapiolani entities and SMS, the supplier of the computer software purchased by InfoTech. On January 4, 1995, Peat Marwick filed the third party complaint for indemnification and contribution against the Kapiolani entities and SMS. Thereafter, the case was designated as complex litigation and assigned to Judge Kochi.

On July 6, 1995, SMS counterclaimed against Peat Marwick, asserting that the filing of the third party complaint was abusive because it was motivated by the improper objective of delaying the scheduled trial date. The Kapiolani entities moved to dismiss the third party complaint, alleging that Peat Marwick had no viable claim for which relief could be granted against the Kapiolani entities because Straub had released the Kapiolani entities from any and all liability arising from the joint venture when it signed the settlement and mutual release. The motion was denied.

On July 19, 1995, the Kapiolani entities moved to disqualify the Torkildson firm from continuing to represent Straub on the ground that the Torkildson firm had formerly represented the Kapiolani entities and had been counsel for the Kapiolani entities in matters substantially related to the subject matter of the present lawsuit. In particular, the Kapiolani entities argued that the Torkildson firm had done all of the legal work for InfoTech, had given business advice regarding its formation and structure, had drafted the joint venture and all other necessary legal documents, and had continued to represent InfoTech after it had been established as a separate partnership. The Kapiolani entities submitted that Straub's actions established adversity between the parties. When the Kapiolani entities were served with the third party complaint, the Kapiolani entities had asked Straub to hold it harmless by virtue of the settlement agreement. According to the Kapiolani entities, Straub had refused to hold it harmless unless it paid substantial monetary consideration to Straub.[3] When the Kapiolani entities filed its motion seeking dismissal from the action, Straub filed a statement of no position. Finally, in its status conference and discovery conference statement, Straub complained that the Kapiolani entities had objected to Straub's first request for production of documents regarding financial information pertaining to the joint venture and the identity of key witnesses.[4]

Straub opposed the motion to disqualify the Torkildson firm on the grounds that: (1) Straub and the Kapiolani entities were not adverse and could not be adverse because of the settlement and mutual release; (2) because the Kapiolani entities had agreed to the former concurrent representation of Straub, Kapiolani Information Systems, and InfoTech, the Kapiolani entities could not claim that any information obtained by the Torkildson firm was confidential as to Straub; and (3) disqualification after two years of litigation would be extremely prejudicial to Straub.

Following a hearing, Judge Kochi took the matter under advisement, but subsequently granted the motion for disqualification based upon findings of fact and conclusions of law set forth in a minute order appended to the order of disqualification.[5] Judge Kochi determined that the present action—initiated

---

**3.** Present counsel for the Kapiolani entities has represented that he contacted Straub's counsel to discuss dismissal of the Kapiolani entities from the action. Straub's counsel has apparently advised that Straub would not hold the Kapiolani entities harmless unless Straub was paid several million dollars.

**4.** In its first request for production of documents, Straub sought all documents relating to the joint venture or to InfoTech from the inception of the joint venture through its termination, including billing information, documents relating to meet-ings, personnel records of InfoTech's employees, financial records of InfoTech, and financial records of the Kapiolani entities relating to InfoTech.

**5.** Judge Kochi also noted that it appeared that the Torkildson firm had continued to represent InfoTech in unrelated matters and that, under Hawaii Rules of Professional Conduct (HRPC) 1.7(a), the Torkildson firm could not represent another client against InfoTech without InfoTech's consent, which had not been given.

HRPC 1.7(a) provides:

by the Torkildson firm on behalf of Straub against Peat Marwick, which in turn named the Kapiolani entities as third-party defendants—was substantially related to the former matter in which the Torkildson firm had represented Kapiolani and that the interests of the Torkildson firm's present client were materially adverse to those of its former client. Thus, the court concluded that disqualification was required pursuant to *Otaka v. Klein*, 71 Haw. 376, 791 P.2d 713 (1990). A subsequent motion for reconsideration was denied on February 1, 1996.

Straub filed the instant petition, which seeks either to vacate the disqualification order or to limit the disqualification to Hetherington and Fonseca, thereby permitting other attorneys associated with the Torkildson firm to continue to represent Straub in this matter.

## II. *STANDARD FOR DISPOSITION*

■ A writ of mandamus is an extraordinary remedy that will not issue unless the petitioner demonstrates: (1) a clear and indisputable right to relief; and (2) a lack of other means adequately to redress the alleged wrong or obtain the requested action. *Tanaka v. Nagata*, 76 Hawai'i 32, 35, 868 P.2d 450, 453 (1994). Such writs are not meant to supersede the legal discretionary authority of the lower courts, nor are they meant to serve as legal remedies in lieu of normal appellate procedures. *State ex rel. Marsland v. Town*, 66 Haw. 516, 668 P.2d 25 (1983). Where a trial court has discretion to act, mandamus clearly will not lie to interfere with or control the exercise of that discretion, even when the judge has acted erroneously, unless the judge has exceeded his or her jurisdiction, has committed a flagrant

and manifest abuse of discretion, or has refused to act on a subject properly before the court under circumstances in which it is subject to a legal duty to act. *State ex rel. Marsland v. Ames*, 71 Haw. 304, 307, 788 P.2d 1281, 1283 (1990). This court has determined that a petition for a writ of mandamus and/or prohibition is an appropriate vehicle for reviewing an order of disqualification. *Chuck v. St. Paul Fire and Marine Ins. Co.*, 61 Haw. 552, 606 P.2d 1320 (1980). "[W]here the basis upon which the trial court has rested its order of disqualification is clearly insufficient, *and* a convincing showing is made in the petition that irreparable and immediate harm would otherwise be the necessary consequence, the petitioner's application for a writ of mandamus will be granted." *Id.* at 558, 606 P.2d at 1324 (emphasis added).

■ In *Otaka v. Klein*, 71 Haw. 376, 791 P.2d 713 (1980), this court adopted the "substantial relationship" test derived from *T.C. Theatre Corp. v. Warner Bros. Pictures*, 113 F.Supp. 265 (S.D.N.Y.1953), when reviewing issues relating to the disqualification of an attorney who is alleged to be representing a party whose interests are adverse to those of former clients. Pursuant to the "substantial relationship" test,

"the former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client."

*Id.* at 386, 791 P.2d at 719 (quoting *T.C. Theatre Corp.*, 113 F.Supp. at 268).[6]

■ When we consider whether a substantial relationship requiring disqualification is

---

A lawyer shall not represent a client if the representation of that client will be directly adverse to another client unless:
    (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
    (2) each client consents after consultation.

**6.** The "substantial relationship" test was codified in HRPC 1.9(a), which provides:

A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.

present, it is assumed that, during the course of the former representation, confidences bearing on the subject matter of the current representation were disclosed to the attorney. *Id.* The client is not required to show that actual confidences were disclosed. *Trone v. Smith,* 621 F.2d 994, 998–99 (9th Cir.1980). "Substantiality is present if the factual context of the [former and present] representation are similar or related." *Otaka,* 71 Haw. at 386, 791 P.2d at 719 (quoting *Trone,* 621 F.2d at 998).

### III. *DISCUSSION*

Straub recognizes that the grant or denial of a motion for disqualification is within the discretion of the trial court, but contends that Judge Kochi misapplied the substantial relationship test, thereby acting outside the limits of his discretion, in two respects. First, Straub asserts that the substantial relationship test is altogether inapplicable to the present case because the Kapiolani entities agreed to the previous concurrent relationship and had no objective basis for believing that the Torkildson firm would conceal from Straub confidential information that was related to the joint venture. Second, Straub argues that, even if the substantial relationship test applies to the present case, the requisite adversity between Straub and the Kapiolani entities is not present. Alternatively, Straub contends that disqualification of the Torkildson firm in its entirety would cause irreparable harm to Straub and that any disqualification should be limited to Hetherington and Fonseca.

The Kapiolani entities argue that, given the Torkildson firm's longstanding relationship with the Kapiolani entities and the clear violation of the firm's ethical obligation to the Kapiolani entities, Straub has not demonstrated that Judge Kochi committed a flagrant and manifest abuse of discretion by granting the motion to disqualify.

A. *The Substantial Relationship Test Is Applicable.*

██ As we have indicated, Straub first contends that the substantial relationship

test does not apply to the present dispute because the Kapiolani entities agreed to the former concurrent representation and had no basis to expect that the Torkildson firm would withhold information from Straub regarding the joint venture. In support of its contention, Straub urges this court to adopt the holding of *Allegaert v. Perot,* 565 F.2d 246 (2d Cir.1977).

In *Allegaert,* the plaintiff bankruptcy trustee sought disqualification of the defendant's counsel—the law firms of Weil, Gotshal & Manges (the Weil firm) and Leva, Hawes, Symington, Martin & Oppenheimer (the Leva firm)—pursuant to Canon 4 of the ABA Code of Professional Responsibility.[7] The two law firms had represented the DGF Corporation and the defendants, who managed it. The defendants had formerly controlled the bankrupt in a realignment of two brokerage firms. During the realignment, the Weil and Leva firms had been the primary counsel for the defendants. The bankrupt had been represented by independent counsel, Shearman & Sterling. After the realignment, the Weil and Leva firms remained the primary counsel for the defendants, but also performed legal services for the bankrupt relating to the action in which disqualification was sought. Noting that the bankrupt was advised by independent counsel at every step, the *Allegaert* court did not apply the substantial relationship test because the bankrupt had necessarily known that the information given to the Weil and Leva firms would be conveyed to their primary clients pursuant to the realignment agreement. *Allegaert,* 565 F.2d at 250. Thus, in the court's view, the bankrupt could have no expectation that confidential information would be withheld from the defendants. According to the *Allegaert* court, "before the substantial relationship test is even implicated, it must be shown that the attorney was in a position where he *could* have received information which his former client might reasonably have assumed the attorney would withhold from his present client." *Id.* (Emphasis in original.)

7. Canon 4 provides that "[a] lawyer should pre- serve the confidences and secrets of a client."

The Kapiolani entities argue that we should deem the *Allegaert* holding inapplicable in Hawai'i because Canon 4, under which the case was decided, is less restrictive than Hawai'i Rules of Professional Conduct (HRPC) 1.9(a) and does not accord the latter's broad protection. *See supra* notes 5 and 6.

Other courts have identified several purposes underlying rules identical with HRPC 1.9(a):

> It is a prophylactic rule to prevent even the potential that a former client's confidences and secrets may be used against him. Without such a rule, clients may be reluctant to confide completely in their attorneys. Second, the rule is important for the maintenance of public confidence in the integrity of the bar. Finally, and importantly, a client has the right to expect the loyalty of his attorney in the matter for which he is retained.

*In re Corn Derivatives Antitrust Litigation,* 748 F.2d 157, 162 (3d Cir.1984) (citation omitted), *cert. denied, Cochrane & Bresnahan v. Plaintiff Class Representatives,* 472 U.S. 1008, 105 S.Ct. 2702, 86 L.Ed.2d 718 (1985).

Given the broad protections of HRPC 1.9(a), courts in jurisdictions following the model rules have questioned the applicability of the *Allegaert* holding. For example, in *Koch v. Koch Industries,* 798 F.Supp. 1525, 1534 (D.Kan.1992), the court expressed doubt as to whether the *Allegaert* rule, removed from its narrow factual underpinning, could be applied in harmony with Rule 1.9(a), inasmuch as the protection accorded by Rule 1.9(a) extended beyond the preservation of confidential information.

> The court is convinced that the *Allegaert* rule fails to account for an important aspect of Rule 1.9(a), that is, an attorney owes to a former client a duty of loyalty which is breached when the attorney switches sides and begins representing an adverse interest in matters substantially related to the former representation.... Simply put, the rationale of *Allegaert* does not encompass the scope of Rule 1.9(a). Finally, Rule 1.9(a), by its terms, is not limited to situations where the former client would be harmed by the possible divulgence of confidential information. It imposes an ethical obligation irrespective of harm[.]

*Koch,* 798 F.Supp. at 1535 (citations omitted).

Similarly, in *Prisco v. Westgate Entertainment, Inc.,* 799 F.Supp. 266 (D.Conn.1992), the court noted that "the central problem with the application of the *Allegaert* rule" to the case before it was that *Allegaert* was based on Canon 4 of the ABA Code of Professional Responsibility and not the Model Rules of Professional Conduct. *Prisco,* 799 F.Supp. at 271. The *Prisco* court analyzed the problem as follows:

> Neither the Canon nor the ethical considerations or disciplinary rules that follow address the specific former client situation. The Second Circuit has taken the narrow dictates of Canon 4 and developed a former client rule triggered by confidentiality. Model Rule 1.9 is designed to address not only the narrow need to protect a client's confidences, but also to establish broader standards of attorney loyalty and to maintain public confidence in the legal system.

*Id.* (Citations omitted.)

Inasmuch as the *Allegaert* rule was based solely on Canon 4, and this court has adopted the HRPC, which are fashioned after the model rules, we hold that the *Allegaert* rule is inapposite to a motion for disqualification pursuant to HRPC 1.9(a). But even if we were to recognize the viability of the *Allegaert* rule under some circumstances, the present case is distinguishable from the facts before the *Allegaert* court. First, it is not clear from the record before us that the Torkildson firm ever advised the Kapiolani entities of the risks inherent in joint representation.[8] Furthermore, unlike the former

---

8. *See* HRPC 2.2(a), which provides:

(a) A lawyer may act as intermediary between clients if:

client seeking disqualification in *Allegaert*, the Kapiolani entities were not advised by independent counsel throughout the course of the negotiations culminating in the implementation of the joint venture. The Torkildson firm was the Kapiolani entities' primary counsel and became InfoTech's primary counsel after its formation. Thus, it was reasonable for the Kapiolani entities to presume that the Torkildson firm would not take an adverse position to it in future litigation concerning the formation of InfoTech.

The *Allegaert* rule being inapposite to the present case, we hold that Judge Kochi properly reviewed the Kapiolani entities' motion for disqualification under the "substantial relationship" test. There is no question that the former representation of the Kapiolani entities by the Torkildson firm was substantially related to the present litigation. Because a substantial relationship between the former representation and present litigation has been shown, we must determine whether the parties are materially adverse.

B. *The Torkildson Firm's Present And Former Clients Are Materially Adverse In This Action.*

██ Straub contends that it could never be materially adverse to the Kapiolani entities due to the settlement and mutual release previously executed by the parties. Contrary to Straub's contention, however, its conduct in the present case supports Judge Kochi's finding that the parties are indeed materially adverse. First, Straub stipulated to the Kapiolani entities being named as third party defendants and took no position

when the Kapiolani entities moved, pursuant to the settlement agreement, for dismissal of the third party complaint that had been filed against them. Second, when the Kapiolani entities sought to resolve the issue, Straub refused to hold the Kapiolani entities harmless unless Straub was paid several million dollars as consideration. Finally, third, the positions of the parties regarding the central issue in the litigation—the relative merits of forming InfoTech as compared to the creation of an in-house computer system—are mutually exclusive: Straub has asserted that forming the joint venture was a mistake, while the Kapiolani entities have asserted that it was the right decision.

C. *Because The Circuit Court Rested Its Order Of Disqualification On A Clearly Sufficient Basis, We Do Not Reach The Question Of Irreparable And Immediate Harm To Straub.*

██ Inasmuch as a substantial relationship between the Torkildson firm's former representation of the Kapiolani entities and the present litigation has been shown and the record supports Judge Kochi's finding that Straub—which the Torkildson firm represents—and the Kapiolani entities are materially adverse parties to the present entities, it therefore follows, and we so conclude, that "the basis upon which the trial court rested its order of disqualification" is not "clearly insufficient." *See Chuck*, 61 Haw. at 558, 606 P.2d at 1324.

Relying on *Chuck*, however, Straub contends that it will be irreparably harmed if the Torkildson firm is disqualified and prays that

(1) the lawyer consults with each client concerning the implications of the common representation, including the advantages and risks involved, and the effect on the attorney-client privileges, and obtains each client's consent to the common representation;

(2) the lawyer reasonably believes that the matter can be resolved on terms compatible with the clients' best interests, that each client will be able to make adequately informed decisions in the matter and that there is little risk of material prejudice to the interest of any of the clients if the contemplated resolution is unsuccessful; and

(3) the lawyer reasonably believes that the common representation can be undertaken impartially and without improper effect on other responsibilities the lawyer has to any of the clients.

Comment [8] on Rule 2.2, subsumed within the title "Consultation," advises that, "[i]n acting as intermediary between clients, the lawyer is required to consult with the clients on the implications of doing so, and proceed only upon consent based on such a consultation. The consultation shall make clear that the lawyer's role is not that of partisanship normally expected in other circumstances."

any disqualification that may be sustained be limited to two attorneys—Hetherington and Fonseca. In this connection, we have already noted that (1) in 1987, Hetherington prepared the joint venture agreement and the long-term exclusive services contracts involving Straub, Kapiolani Information Systems, and InfoTech, (2) in 1991, when Straub sought to withdraw from the joint venture, Hetherington advised Straub, Kapiolani Information Systems, and Infotech to retain independent counsel to arbitrate the breakup of the join venture, and (3) at the time the motion to disqualify was filed in the present litigation, Fonseca was preparing retirement plans for the Kapiolani entities. Thus, the inference is inescapable that, despite the fact that, as early as 1991, the Torkildson firm recognized the conflict that would arise out of litigation among the parties, it continued to perform services for the Kapiolani entities even as it represented Straub in the present litigation.[9] It would therefore appear that Straub and the Torkildson firm have brought any economic inconvenience that might befall Straub in the event that the Torkildson firm were disqualified from representing Straub in the present litigation upon themselves.[10]

In any event, the *Chuck* analysis is of no assistance to Straub's position because the issue of "immediate and irreparable harm" is reached only if the foundational basis of the trial court's disqualification order is otherwise "clearly insufficient." *Id.* at 558, 606 P.2d at 1324. Accordingly, we need not reach the issue.

We hold that Rule 1.9 requires disqualification of the Torkildson firm.[11]

## IV. CONCLUSION

Based upon the foregoing, the petition is denied.

---

**9.** *See* HRPC 2.2(c), which provides:

A lawyer shall withdraw as intermediary [between clients] if any of the clients so request, or if any of the conditions stated in [HRPC 2(a)] is no longer satisfied. Upon withdrawal, the lawyer shall not continue to represent any of the clients in the matter that was the subject of the intermediation.

Comment [10] on rule 2.2, entitled "Withdrawal," advises that "[c]ommon representation does not diminish the rights of each client in the client-lawyer relationship. Each has the right to loyal and diligent representation ... and the protection of Rule 1.9 concerning obligations to a former client."

**10.** In making this observation, we express no opinion regarding the respective rights and liabilities of Straub and the Torkildson firm, vis-a-vis each other, in the event of a future dispute between the two.

**11.** Straub also contends that Judge Kochi misapplied HRPC 1.7. Inasmuch as we have determined that Rule 1.9(a) requires disqualification, we need not address the applicability of HRPC 1.7.